Good morning. May it please the court? My name is Michael Ryan and I represent the appellant Cristino Lopez-Martinez. I believe this court is confronted in this case by a fairly unusual set of facts, particularly with regard to what happened with the jury. I believe that the case should be remanded to the district court for a new trial. The alternate juror in this case, as the court may recall, crafted his own jury instructions by going onto the internet. Those jury instructions differed from the ones that the trial judge ultimately gave to the jury. The instructions were there the entire time. But there is no evidence that any of the regular jurors looked at it, right? I disagree with that, Your Honor, with all due respect. There is no evidence that supports your disagreement. Two of the jurors, a couple of things. Two of the jurors did, in fact, say that they saw the jury instructions. But upon the district court's further examination of the juror, almost in the style of rehabilitating an impeached witness, they retracted. I think, you know, we're kind of left in a situation, correct me if I'm wrong here, but, of course, we say jury instructions, and we know we're now talking about this little thing in the envelope. And then, of course, there's a set of jury instructions that go into the jury room. I thought that the judge made the determination based on the testimony that when it was clarified that they were talking about, oh, that they'd only seen the one set of jury instructions that went into the jury room. But am I wrong about that? I mean, first they said they thought they'd seen these documents. But then when it was clarified, well, are you talking about the court's instructions, that's what they thought they saw. It is confusing. I agree. And here's my problem. I objected to it. I was the trial attorney. You didn't want a hearing. I didn't want a hearing because there was no dispute. As I understand Ninth Circuit case law, a hearing is required when the court needs to ascertain the nature of the extraneous material that the jury was exposed to. But I have to tell you, I never heard of it. On the other hand, I never heard of an error in granting a hearing even though it was not required. It's sort of like, you know, well, I don't have to hear your argument, but I'm going to let you argue anyway. How could that be error? I'm going to decide this case without oral argument, but I'm going to let you argue. How can that be error? I'm not sure. Isn't that what this amounts to? I'm not sure I'm suggesting it's error. I think the way the hearing was conducted was error. It's one of the points of error you list in your brief, that he permitted, you know, evidentiary hearing. But it's odd because usually the defense wants an evidentiary hearing. So this is an unusual posture. Yeah. Well, maybe I shouldn't have styled it that way. I think I meant more in the nature of the ñ well, I didn't think a hearing was necessary. And I think in this case the fact of the hearing is a problem because it's three months later. And the jurors are being asked some questions about what they saw or didn't see in the jury room. And here's another part of the problem with that hearing is that the judge sets the jurors up with a framework to deny that they saw the material. He starts out, at first the entire panel was present in the courtroom, and he begins by announcing to the entire jury, the reason we're here is because there was material that was in the courtroom, rather, in the jury room, that was not provided by the court and was not part of the evidence in the record. And we need to ascertain whether or not, you know, we need to ascertain how you viewed that or saw that. I mean, with all due respect to Judge McNamee, that's telling the perspective ñ not perspective. That's telling the jury pool that we have, you shouldn't have looked at that document. That was a no-no. So I don't think we ever got to the real truth of what the jurors may or may not have seen. And, again, it seems to me Ninth Circuit case law says, hold a hearing to determine the nature of the extraneous material that the jury was exposed to, not the kind of hearing Judge McNamee held, which was to ask them if they read it, if they saw it. And then the other thing ñ well, you know ñ But isn't that what you usually have when you have one of these hearings, for example? Like, you usually have, like, some ñ one of the jurors might have gone on the Internet or whatever, and then you bring them back in and you find out if the other jurors had the same ñ you know, that's what you're looking at is a taint in the jury room. Isn't that what he was really doing? I mean, in all these post-trial hearings, they're admittedly problematic because they're not always held right immediately. But how else ñ I guess you're saying it's error for him to set the stage. Is that the argument? Absolutely, Your Honor. And he did set the stage. And when I objected in January, a month before the hearing was held, I didn't ñ I wasn't sure if Judge McNamee was going to hold a hearing or what he was going to do. He asked me to file a motion. I filed the motion about five days later, six days later. The government responded. And then in January, two months after this trial, he calls us into court and announces that he plans on subpoenaing all of these jurors for a hearing. And I objected. What is the hearing for? We know the nature of the extraneous material. Well, you had the hearing, and he asked these questions. And I think your complaint really is ñ and you almost said this ñ most of his questions was, if a lawyer asked it, you would call it a leading question, right? And he kind of suggested the answer. But ñ and I think your complaint really is, well, he didn't give you a chance to cross-examine the witnesses after he asked those questions. But you never asked to examine the witnesses, did you, at that hearing? I don't ñ I ñ Yeah? He ñ Did you say, I want to exercise my right to cross-examination? I don't think so. I don't see anything like that. At least I didn't see it in the record. If I recall, Judge, Judge McAtemy determined prior to the hearing that we were not allowed to question the jurors. All right. But, I mean, after he asked these questions that you believe were leading and suggestive, you didn't say, well, you know, I'd like to ask some cross-examination questions of my own? You didn't make a record on that, did you? There ñ I believe, Your Honor, in the January ñ At least it's not in, you know, the ñ I believe in the January hearing he told us he was not going to allow us ñ But that was before the fact, when you didn't know what questions he was going to ask. After you heard these, what you characterize as, you know, suggestive questioning, and you may be correct, but after you heard those questionings, that was your time to correct it, right, by, you know, cross, and you didn't ask for that right at that point. I did not. That's true. I believed I had preserved the issues by objecting to the hearing and objecting to ñ and at the January status conference I said the problem with holding a hearing like this in the way that the judge proposed was the very thing that he did. You're going to telegraph to the jury that it should not have read those particular instructions. And sure enough, the first words out of his mouth at the beginning of the hearing, when all jurors were present, were, we have some extraneous material that was presented to the jury and we need to ascertain whether, you know, the particular Ps and Qs of this document. And we are allowed to draw reasonable inferences in a trial. We should be allowed to draw a reasonable inference, particularly when an important constitutional right, like the right to a jury trial, is at stake here. And the document was wide open in the middle of the ñ according to the judge's own clerk, in the middle of the jury room table, open for them to see throughout deliberations. So there really was no reason to inquire to the jury, you know, what they saw or when they saw it. And when they're being asked that after being told that they shouldn't have seen it, of course they answered, we didn't see it. Most of them did. Two of them did not. Well, he didn't say that. Judge McEwen didn't say that, did he? Now, I want to question you, whether you saw a document that you weren't supposed to look at? He didn't ask that kind of question. Well, he didn't put it in that ñ in quite those terms. I can find you ñ Oh, I think it's fairness to him. He's not here to defend himself, but, you know, I have the transcript. I think, you know, it's fairly objective. I mean, he is meticulous, you know, and he's ñ and as Judge McEwen says, he's trying to separate out, you know, this, I'll call it, you know, renegade package from ñ apparently there was a set of, I'll call them authorized jury instructions in the jury room, right? Apparently. Right. And so he was trying to ñ and actually, you know, if you just ask a jury, well, you know, did you see the jury instructions, they're probably going to say yes because you think they're referring to the regular instructions. But so he, you know ñ That was actually the problem to begin is they had seen the jury instructions. Yeah, he's trying to separate that out. And, you know, I don't think it's a leading or suggestive that they're now, you know, wink, wink, now tell me you didn't see these, right? It's not that kind of questioning. Well, with all due respect, Your Honor, you're the judge. I disagree. I mean, his language is because this document was not admitted into evidence and it was not provided by the court, it is important that we ascertain whether you were aware of the document during your deliberations. It wouldn't take a brain surgeon to understand that this document should not have been there and that the jurors should not have looked at it. And again, your question ñ The question I have is this, whether the record tells us how the document got on top of the table. Because I thought Juror 37 said he left it inside a sealed envelope. Right. That bolsters my case, Your Honor, in my view, because he very unequivocally testified that the document was ñ My question, though, is I'm not saying it's for or against your case. I'm asking you what the record tells us, if anything, about how the document got onto the table unopened. Or opened, if it's opened. Juror 37 said that he left it in the jury room, sealed. He had not discussed it with anyone. Judge McNamee's law clerk, who was the bailiff over the jury, found it. He said in the middle of the jury table with the document outside the envelope, face up on top of the envelope. The reasonable inference I believe we can draw from that is that ñ The fact is we don't know. We don't know what happened between it being sealed and the jury being in there and the jury leaving, and then it being found outside the envelope. You see, look, Judge McNamee makes a series of factual findings, right, in his order ñ in his order, you know, denying ñ denying your motion. And one of the findings is court finds that the record failed to establish that any deliberating juror was aware of the extrinsic information. Now, you have to convince us that that's clearly erroneous. I believe it's clearly erroneous. Because, you know, you could maybe come to another conclusion. But he does ñ not necessarily, I don't think. And he does, you know, consider the evidence that was there. And he also does acknowledge that in reading this finding, the court considered the inconsistent testimony regarding the state of the information that was discovered by the law clerk. So, you know, I mean, he goes through all of the evidence and he comes ñ he makes his finding. It's a permissible finding as far as I can tell. I mean, it's not contrary to the evidence, is it? I believe it's contrary to the evidence, Your Honor. I believe it's clearly erroneous. To the inferences you want to draw, maybe, but. Well, he excluded every inference that suggested that the jury saw it and found every inference in favor of the government. He placed the burden on me to show prejudice and to show that this document tainted the jury when it was really the government's burden. And I believe in ñ you know, with all due respect, Judge McNamee, I think he is a meticulous judge. I'm not ñ and I know he's not right here this minute to defend himself. But, I mean, quite frankly, you had two jurors who point blank said, yes, they saw the document. And then after questioning, leading questioning by the judge, changed their minds. Also, please keep in mind that the jury was shown a color version of the document that had court stamps on it and a court number on it that I realized two-thirds of the way into the hearing, that's what they had been shown. So you're asking jurors three months later, after the holidays and everything else, to look at a document that the judge tells them, you know, that was not provided by the court, it was not evidence, and we must ascertain whether you were aware of it. I mean, I think the ñ I think that record's pretty clear. I'd like to reserve, if I may. You may. Good morning, Your Honors. May it please the Court. My name is Tracy Bardorf. I'm an assistant United States attorney, and I represent the United States, the appellee in this matter. With regard to the extraneous materials in the courtroom, there was no error. As the Court has just discussed at length, each and every one of the jurors, with the exception of the alternate, said under oath that they had not seen or considered the additional jury instruction that the alternate had prepared and left in the jury room. It is definitely an open question as to how the envelope got unsealed. Juror 37 said that when he was asked if he had left it in a sealed condition, he said to the best of his knowledge. Somehow it got out of the envelope. But, again, every one of the jurors who deliberated in this case testified under oath at the hearing that they had not considered the extraneous materials. Well, there is some discomfort about the way the hearing progressed with the jurors ñ two of the jurors saying, well, yes, they had. And they were looking at the document. They were given this document, and they say, yes, they had seen this. So I guess the question is whether their testimony is, in effect, a wash. When I've seen it, oh, no, no, then I didn't see it. Mr. Ryan is right. It is unfortunate that the hearing took place months after the actual verdict was rendered. It would have been possibly much easier had it been conducted earlier. That was a function of the Court's calendar and the need to re-summon the jurors. At the same time, the other ñ again, each of them, when reminded, there was a separate set of jury instructions, the thick packet that the judge had sent in. They all said at that point, right, those are the ones that we considered. I would also point out to the Court that, ultimately, one of the elements that the Court must consider is whether the extraneous materials  In this case, the reasonable doubt instruction that was on the table actually set a higher standard for the government than the actual reasonable doubt standard provided in the official jury instructions because the reasonable doubt instruction that Juror 37 had compiled required proof to a moral certainty. And the trial court gave the Ninth Circuit model jury instruction, which is probably well-worn before this Court, but it's proof beyond all reasonable doubt, not all doubt. It does not have this component of moral certainty. So, ultimately, the jury instruction actually set a higher standard for the jurors to consider. And even if they had used thatÖ Was that the only difference?  The conspiracyÖ Again, the reasonable doubt instruction that I was referring to is the second one down, and this is at the Excerpts of Record, Tab 9. Again, the final reasonable doubt instruction, I believe, is very consistent with the actual reasonable doubt instruction that was given to those jurors. It doesn't set the standard any lower, that's for sure. It uses the word not fanciful as opposed to the model instruction, which is not beyond all doubt but must be based in reason, which is the official instruction. But Judge McNamee really didn't go into the prejudice factor. He didn't, Your Honors, butÖ He felt, I guess, it was not necessary. Exactly, Your Honor, because he had found that he was convinced that all the jurors had, again, with an opportunity to observe their demeanor and the speed with which they answered questions and, as the trial judge, able to observe them made the finding that none of them had considered it and was confident. Did you make that argument toÖ We did not makeÖ Öthe alternative or not? We did not, Your Honor. The onlyÖ The argument in district court was focused on whether or not the jurors were actually exposed to the instruction. In fact, the argument was more of whether or not to even hold the hearing to determine whether they had been exposed to it and then once the court decided to hold the hearing, there wasn't really any further argument. The judge made the finding at the conclusion of the hearing and then issued the writtenÖ Counsel, what's the, if any, is there a fact theory under which you could credit Juror 37 saying he left it in a sealed envelope and reconcile that with it being open and say none of the jurors saw it? In other words, could they, could it have gotten open on the table without some jurors seeing it or does the fact that it was there inescapably mean that some jurors saw it even if they forgot? The first plausible theory is that when he said, when he was asked whether he had left it in a sealed condition and he said not to my knowledge, is that perhaps he had actually opened it and looked at it himself or opened it in anticipation of looking at it and then forgot it there. Of course, then that would lead me down the road of Your Honor saying, well, maybe all the other jurors simply forgot that they considered it. But again, when we put our jurors under oath, we have to place some trust in the jurors that what they're telling us is the truth. If we have to second guess every time that they are under oath and tell the court something, we have a more fundamental problem with the entire verdict. The other possibility is that he left it on the table and one of the jurors saw it and said, what's this? There was nothing on the envelope other than a scrawled number 37, so perhaps a juror opened it and when they opened it said, I don't know what this is, and left it on the table and didn't read it. And maybe that's how it comes that none of the jurors considered it. Other than that, I read the record again last night trying to find an answer to that very question, and I have no other answer. There was no envelope opening gremlin who appeared in the jury room. No. Only the jury was in there until the law clerk went in there, right? Right. The law clerk and the deputy clerk, and the court read the testimony that the law clerk gave about how he and Ms. Abraham were the first two into the room. For whatever reason, no one questioned Ms. Abraham, but it sounds like they walked in simultaneously and found the envelope, so it doesn't appear that any of them opened the envelope. So other than that, it doesn't appear that anyone would have been able to get into the jury room other than the jurors. The second issue that the government wanted to address is the issue of the expert testimony, simply to just point out that this would be a harmless error review on the expert testimony. And in this case, the expert testimony was important and useful to the jury because while perhaps jurors in Arizona might be well aware of the fact of alien smuggling and maybe even aware of the issue of stash houses and that aliens do come in through the desert, this case was about much more of the inner workings of alien smuggling and the roles performed starting all the way back in Mexico. You said harmless error. You mean plain error? I'm sorry, plain error. This is an issue, a subject matter that's definitely outside the knowledge of the average juror in terms of how people physically get from the border towns, through the stash houses, through the desert. And there's been a lot of issue about the roles played in this case and the facts and how they lead to the jury's verdict of guilty in this case. But with the combination of Mr. Camacho's repeated testimony that the appellant was the one guiding the group through the desert, the expert testimony was offered to help the jury place that into context and place his role in the conspiracy into context with the one who was undoubtedly the leader of this organization, which was Miguel. If Your Honors have nothing further, then I will simply ask that the judgment of conviction and the sentence be affirmed. Thank you. Mr. Ryan. Judge McEwen, could we take a short oh, sorry, we've got the I was just going to finish the rebuttal and then I thought we might take a break. The case was a close case. And Judge Why do you say that? Well, Judge McAmey said it. The three sentence report writer said it. Everyone said it. And in the end, the conspiracy You mean in an evidentiary sense? Yeah. Yes. Yes, Your Honor. In fact, I think the Rule 29 motion should have been granted, and that's why I did brief that issue, although I know we typically don't win on that in the Court of Appeals. But still, it's a close case. And just in conjunction with the juror issue and the other issues we raised in the brief, Mr. Lopez-Martinez should be entitled to a new trial. And speculating on theories about how the envelope could be opened and arguing that the instructions may have been better for the defense than the actual instructions, although only on reasonable doubt, perhaps, arguably. That's not the point. It's the point that the jurors did something they were expressly instructed by the trial court not to do. Don't research the case on your own. Don't bring your research, your investigation into the jury room. And someone did that, and all of the other jurors were reasonably exposed to it. I disagree with Ms. Bardorf's take on the answers by the jurors. They all said things like, well, I don't really remember, I'm not sure, I don't know. And upon further pressing questioning by Judge McNamee, relented and said they didn't think so, I don't know, things like that. There wasn't that clear cut, no, they never saw it. And quite frankly, after three months, are they going to really remember? You know, that was one of my concerns and my objection to the evidentiary hearing. Anything else that you'd like me to address? Do we have any further questions? That's a lot of issues, and they're well briefed, so we appreciate that. Thank you, Your Honor. Thank you. Have a good day. Thank you to both counsel. The case of United States v. Lopez-Martinez is submitted. Did you have any further questions in this case, Judge Gould? Yeah. Are you getting like a feedback loop where our mic picks up what you say? No. But we can check that now. What we're going to do now is we're going to take a short recess so the attorneys in the next case, United States v. Cuesta, can get organized and set up.
judges: Tashima, McKeown, Gould